## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NORTON SOUND HEALTH CORPORATION**,<br>   1000 Greg Kruschek Avenue<br>   Nome, Alaska  99762<br><br>                              PLAINTIFF,<br><br>              v.<br><br>**UNITED STATES OF AMERICA;**<br><br>**ROBERT F. KENNEDY, JR.**, in his official capacity as Secretary, U.S. Department of Health and Human Services,<br>   200 Independence Avenue, S.W.<br>   Washington, DC 20201;<br><br>   and<br><br>**CLAYTON FULTON**, in his official capacity as Chief of Staff, Indian Health Service,<br>   5600 Fishers Lane<br>   Mail Stop: 06E36<br>   Rockville, Maryland  20857<br><br>                              DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. _____<br>)<br>)  **COMPLAINT FOR DECLARATORY,**<br>)  **MANDAMUS AND INJUNCTIVE**<br>)  **RELIEF**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR DECLARATORY, MANDAMUS AND INJUNCTIVE RELIEF

1

The Plaintiff, for its cause of action against the Defendants named above, alleges as follows:

## INTRODUCTION

1.      Plaintiff, the Norton Sound Health Corporation ("NSHC"), is an Alaska Native Regional Non-Profit Corporation which operates a comprehensive health services delivery program for its twenty Alaska Native village member tribes, and other eligible American Indians and Alaska Natives, in the Bering Strait region of Northwest Alaska.

2.      NSHC, on behalf of its member tribes, operates its health services delivery program as a Co-Signer to the self-governance Alaska Tribal Health Compact ("ATHC"), and under funding agreements with the Indian Health Service ("IHS"), authorized by Title V of the Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. § 5381, *et seq*.

3.      As part of its compacted health services program, NSHC delivers public and environmental health services in remote village locations throughout its service area.  Section 3.4.9 of NSHC's current Funding Agreement with the IHS states that NSHC will operate an Office of Environmental Health, which may provide various programs and services including "washeterias[.]"  Appendix B to the Funding Agreement lists "Washeterias" in "All Villages" as among the facilities used by NSHC to carry out the compact and Funding Agreement.

4.      Washeterias provide access to clean water for drinking, laundry, and personal hygiene purposes in remote locations where individual homes lack access to running water and sewer services.  As such, they play a critical role in public health and preventive care in some of the most isolated and underserved communities in the country.

5.      Section 105(*l*) of the ISDEAA ("section 105(*l*)") requires the IHS to enter into a lease with a tribe or tribal organization for any facility that is owned or leased by that tribe or

2

tribal organization and used by the tribe or tribal organization to administer and deliver services under its ISDEAA agreements.  25 U.S.C. § 5324(*l*).

6.      On August 12, 2025, NSHC submitted a proposal for IHS to enter into a lease under section 105(*l*) for the allocable share of a washeteria facility in Wales, Alaska, that NSHC leases from the City of Wales to provide washeteria services to NSHC beneficiaries under NSHC's ISDEAA Funding Agreement (the "Wales Washeteria").  The section 105(*l*) lease agreement as proposed by NSHC stated that it would be included as an attachment to NSHC's ISDEAA Funding Agreement and deemed a part thereof.

7.      Despite multiple requests from NSHC to provide an update and timeline for IHS's review of the proposal, IHS did not provide a response to the proposal or a timeline to respond to the proposal.

8.      Title V of the ISDEAA provides that in the event a tribe or tribal organization and the IHS are unable to agree, in whole or in part, on the terms of a funding agreement (including funding levels), the tribe or tribal organization may submit a "final offer" to the IHS. 25 U.S.C. § 5387(b).

9.      NSHC submitted a final offer to the IHS on September 30, 2025 ("Final Offer").  The Final Offer included a copy of the proposed section 105(*l*) lease for the Wales Washeteria as previously submitted on August 12, 2025, as well as a separate amendment to NSHC's ISDEAA Funding Agreement to incorporate the lease as stated in Section 8 of the proposed lease.

10.      The IHS issued a letter denying the lease proposal for the Wales Washeteria on October 3, 2025, stating that it would respond separately to NSHC's Final Offer letter and proposed ISDEAA Funding Agreement amendment.  On November 14, 2025, IHS also rejected NSHC's Final Offer, stating that the final offer provisions of Title V of the ISDEAA did not

apply to NSHC's proposal and, in the alternative, rejecting NSHC's Final Offer under the Title V statutory rejection criteria.

11.     Among other things, the IHS took the position that the Wales Washeteria is not eligible for a section 105(*l*) lease, and the final offer provisions do not apply to the proposal, because: (1) the lease agreement between NSHC and the City of Wales functions as a "service contract" and does not confer a leasehold interest; (2) despite section 3.4.9 of NSHC's current ISDEAA Funding Agreement, which expressly identifies washeterias as part of NSHC's environmental health program, "the operation and maintenance of a washeteria is not an authorized program, service, function, or activity that may be incorporated into a Title V funding agreement"; and (3) the lease compensation amount requested by NSHC on the basis of a fair market rental appraisal by an independent certified appraiser is not reasonable and would duplicate funding NSHC already receives for a separate health clinic facility in the City of Wales.

12.     NSHC maintains that the IHS is legally required to respond to its Final Offer proposal to enter into the Wales Washeteria section 105(*l*) lease and incorporate it into NSHC's ISDEAA Funding Agreement under the Title V final offer provisions at 25 U.S.C. § 5387(b)–(d), and that the IHS has failed to meet its burden under those provisions of establishing that any of the statutory final offer rejection criteria apply.

13.     NSHC therefore asks this Court for declaratory, mandamus, and injunctive relief, as authorized in section 110(a) of the ISDEAA, 25 U.S.C. § 5331(a), declaring that the Wales Washeteria is eligible for a lease under section 105(*l*) and ordering the Defendants to award and fund the Final Offer as proposed or otherwise enter into and fully fund the proposed section 105(*l*) lease.

**JURISDICTION AND VENUE**

14.     This Court has jurisdiction under section 110(a) of the ISDEAA, 25 U.S.C. § 5331(a), which provides in pertinent part:

> The United States district courts shall have original jurisdiction over any civil action or claim against the appropriate Secretary arising under this [Act] . . . . In an action brought under this paragraph, the district courts may order appropriate relief including money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this [Act] or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this [Act] or regulations promulgated hereunder (including immediate injunctive relief to reverse a declination finding under section 5321(a)(2) of this title or to compel the Secretary to award and fund an approved self-determination contract.)

15.     Section 5331(a) is specifically made applicable to self-governance compacts and funding agreements under 25 U.S.C. § 5391(a).  A self-governance tribe, in lieu of administratively appealing an IHS rejection of its final offer, may "directly proceed to initiate an action in a Federal district court pursuant to section 5331(a) of this title," 25 U.S.C. § 5387(c)(1)(C).

16.     Venue is proper under 28 U.S.C. § 1391(e)(1) because the U.S. Department of Health and Human Services is located in the District of Columbia.

**PARTIES**

17.     NSHC is an Alaska Native Regional Non-Profit Corporation which serves as the tribal organization for twenty federally recognized Alaska Native village tribes located in the Bering Strait region of Northwest Alaska.  NSHC's twenty member village tribes are: Brevig Mission, Council, Elim, Gambell, Golovin, King Island, Koyuk, Diomede, Mary's Igloo, Nome Eskimo Community, Savoonga, Shaktoolik, Shishmaref, Solomon, St. Michael, Stebbins, Teller, Unalakleet, Wales, and White Mountain.  NSHC is located in Nome, Alaska.

18.     NSHC operates health facilities and provides health care services to its member village tribes and other American Indian and Alaska Native beneficiaries as a Co-Signer to the ATHC and pursuant to its funding agreements with the IHS under Title V of the ISDEAA, 25 U.S.C. § 5381, *et seq*.  NSHC is an "Indian tribe" for purposes of Title V and its regulations.  *See* 25 U.S.C. § 5381(b); 42 C.F.R. § 137.10.

19.     Defendant Robert F. Kennedy, Jr., the Secretary of Health and Human Services ("Secretary"), has overall responsibility for carrying out all the functions, responsibilities, authorities, and duties of the U.S. Department of Health and Human Services ("HHS" or the "Department"), including oversight of the IHS, an agency within the Department.  He is sued in his official capacity.

20.     Defendant Clayton W. Fulton is the Chief of Staff of the IHS, the agency charged by law with the responsibility for implementing the ISDEAA and other health laws benefiting American Indians and Alaska Natives, on behalf of the United States, 25 U.S.C. § 1661(c)(3). The Secretary delegated all delegable authorities, duties, and functions of the IHS Director to him in the absence of a confirmed IHS Director.  He is sued in his official capacity.

### STATUTORY AND REGULATORY BACKGROUND

21.     The ISDEAA allows Indian tribes and tribal organizations to assume responsibility to administer programs, services, functions and activities ("PSFAs") that the Secretary is authorized to provide under federal law to American Indians and Alaska Natives.  25 U.S.C. § 5321(a)(1).  The purpose of the ISDEAA is to reduce federal domination of Indian programs and promote tribal self-determination and self-governance.  25 U.S.C. § 5302(b); *Cherokee Nation v. Leavitt*, 543 U.S. 631, 639 (2005).

22.    Title V of the ISDEAA requires the Secretary to establish and carry out within the IHS a program known as the "Tribal Self-Governance Program," 25 U.S.C. § 5382.  Title V requires the Secretary to negotiate and enter into self-governance compacts and funding agreements with tribes and tribal organizations participating in the self-governance program, 25 U.S.C. §§ 5384 and 5385.

23.    Section 5385(b)(1) requires that each funding agreement shall, "as determined by the Indian tribe," include all PSFAs administered by the IHS under certain listed laws, including the Snyder Act, 25 U.S.C. § 13; the Transfer Act, 42 U.S.C. § 2001; the Indian Health Care Improvement Act, 25 U.S.C. § 1601, *et seq.* ("IHCIA"); and

> any other Act of Congress authorizing any agency of the Department of Health and Human Services to administer, carry out, or provide financial assistance to such program service, function or activity (or portions thereof) described in this section that is carried out for the benefit of Indians because of their status as Indians[.]

25 U.S.C. § 5385(b)(2)(A, C, D, F).

24.    Under section 302(b)(2) of the IHCIA, the Secretary is authorized to provide:

> (A)    financial and technical assistance to Indian tribes and communities in the establishment, training, and equipping of utility organizations to operate and maintain Indian sanitation facilities;
> (B)    ongoing technical assistance and training in the management of utility organizations which operate and maintain sanitation facilities;
> (C)    operation and maintenance assistance for, and emergency repairs to, tribal sanitation facilities when necessary to avoid a health hazard or to protect the Federal investment in sanitation facilities.

25 U.S.C. § 1632(b)(2)(A)–(C).

25.    Section 311 of the IHCIA further authorizes the Secretary to "accept from any source . . . funds, equipment, or supplies" to "plan, design, construct, and operate health care or sanitation facilities for Indians, including pursuant to a contract or compact under the [ISDEAA]."  25 U.S.C. § 1638e(a)(2).

26. The IHCIA also obligates the Secretary of the HHS to provide health promotion services to Indians, 25 U.S.C. § 1621b, which includes making available safe water and sanitary facilities and providing adequate and appropriate programs for environmental health; safe and adequate water; and sanitary facilities. 25 U.S.C. §§ 1603(11)(D), 1603(11)(G)(vii), (xx), (xxv).

27. The Indian Sanitation Facilities Act, which amended the Transfer Act, further authorizes the Surgeon General, an official within HHS, to take certain actions related to sanitation facilities for the benefit of Indians. 42 U.S.C. § 2004a *et seq*. In relevant part, the Indian Sanitation Facilities Act authorizes the Surgeon General:

> (1) to construct, improve, extend, or otherwise provide and maintain, by contract or otherwise, essential sanitation facilities, including domestic and community water supplies and facilities, drainage facilities, and sewage- and waste-disposal facilities, together with necessary appurtenances and fixtures, for Indian homes, communities, and lands;
> (2) --
> (3) to make such arrangements and agreements with appropriate public authorities and nonprofit organizations or agencies and with the Indians to be served by such sanitation facilities (and any other person so served) regarding contributions toward the construction, improvement, extension and provision thereof, and responsibilities for maintenance thereof, as in his judgment are equitable and will best assure the future maintenance of facilities in an effective and operating condition . . . .

42 U.S.C. § 2004a(a)(l), (3).

28. In addition to identifying the PSFAs to be performed or administered, Title V funding agreement terms may also include, with respect to those PSFAs,

> "(A) the general budget category assigned; (B) the funds to be provided, including those funds to be provided on a recurring basis; (C) the time and method of transfer of the funds; (D) the responsibilities of the Secretary; and (E) any other provision with respect to which the Indian tribe and the Secretary agree." 25 U.S.C. § 5385(d).

29. Section 105(*l*) of the ISDEAA, 25 U.S.C. § 5324(*l*), expressly made applicable by 25 U.S.C. § 5396(a) to compacts and funding agreements under the Title V Tribal Self-Governance Program, requires the Secretary to enter into certain types of leases with Indian

tribes or tribal organizations, at their request, to provide funding support to facilities used by those Indian tribes or tribal organizations to carry out their PSFAs. Section 105(*l*) provides:

> (1) Upon the request of an Indian tribe or tribal organization, the Secretary shall enter into a lease with the Indian tribe or tribal organization that holds title to, a leasehold interest in, or a trust interest in, a facility used by the Indian tribe or tribal organization for the administration and delivery of services under this subchapter.
> (2) The Secretary shall compensate each Indian tribe or tribal organization that enters into a lease under this paragraph (1) for the use of the facility leased for the purposes specified in such paragraph. Such compensation may include rent, depreciation based on the useful life of the facility, principal and interest paid or accrued, operation and maintenance expenses, and such other reasonable expenses that the Secretary determines, by regulation, to be allowable.

30. Implementing regulations at 25 C.F.R. § 900.74 provide, with respect to section 105(*l*) leases:

> **How may an Indian tribe or tribal organization propose a lease to be compensated for the use of facilities?**
>
> There are three options available:
> (a) The lease may be based on fair market rental.
> (b) The lease may be based on a combination of fair market rental and paragraphs (a) through (h) of § 900.70, provided that no element of expense is duplicated in fair market rental.
> (c) The lease may be based on paragraphs (a) through (h) of § 900.70 only.

25 C.F.R. § 900.70 lists various elements of compensation that may be included if not duplicative, including rent, depreciation, principal and interest paid or accrued, various operation and maintenance expenses, repairs and alterations, and other reasonable expenses.

31. Because a section 105(*l*) lease identifies " . . . funds to be provided, including those funds to be provided on a recurring basis" in support of compacted PSFAs, a section 105(*l*) lease may be incorporated into the terms of an ISDEAA funding agreement. *See* 25 U.S.C. § 5385(d), *Maniilaq Association v. Burwell*, 72 F. Supp. 3d 227 (D.D.C. 2014) (hereafter "*Maniilaq I*").

9

32.    The ISDEAA provides for a "final offer" process in the event of a stalemate in negotiations over the terms of a compact or funding agreement, including incorporation of a proposed section 105(*l*) lease. *See Maniilaq I*, 72 F. Supp. 3d 227. Section 507(b) of the ISDEAA, 25 U.S.C. § 5387(b), provides:

> In the event the Secretary and a participating Indian tribe are unable to agree, in whole or in part, on the terms of a compact or funding agreement (including funding levels), the Indian tribe may submit a final offer to the Secretary. Not more than 45 days after such submission, or within a longer time agreed upon by the Indian tribe, the Secretary shall review and make a determination with respect to such offer. In the absence of a timely rejection of the offer, in whole or in part, made in compliance with subsection (c), the offer shall be deemed agreed to by the Secretary.

33.    Subsection 507(c) of the ISDEAA, 25 U.S.C. § 5387(c), provides that if the Secretary rejects a final offer, the Secretary shall provide:

> a timely written notification to the Indian tribe that contains a specific finding that clearly demonstrates, or that is supported by a controlling legal authority, that--
>
> (i) the amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled under this subchapter;
> (ii) the program, function, service, or activity (or portion thereof) that is the subject of the final offer is an inherent Federal function that cannot be legally delegated to an Indian tribe;
> (iii) the Indian tribe cannot carry out the program, function, service, or activity (or portion thereof) in a manner that would not result in significant danger or risk to the public health; or
> (iv) the Indian tribe is not eligible to participate in self-governance under section 5383 of this title . . . .

25 U.S.C. § 5387(c)(1)(A).

34.    In the event of a timely final offer rejection, the Secretary shall also provide "technical assistance to overcome the objections stated in the notification required" under section 5387(c)(1)(A), *supra*. 25 U.S.C. § 5387(c)(1)(B).

35.    An Indian tribe or tribal organization whose final offer has been rejected may initiate a civil action directly in federal district court to challenge the IHS's rejection of its final

offer, and may seek "appropriate relief including money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this chapter or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty" under the ISDEAA.  25 U.S.C. § 5331(a); 25 U.S.C. § 5387(c)(1)(C).

36.    In any such civil action, "the Secretary shall have the burden of demonstrating by clear and convincing evidence the validity of the grounds for rejecting the offer (or a provision thereof)[.]"  25 U.S.C. § 5387(d).

37.    Title V of the ISDEAA requires that "[i]n the negotiation of compacts and funding agreements the Secretary shall at all times negotiate in good faith to maximize implementation of the self-governance policy."  25 U.S.C. § 5387(e).

38.    Title V of the ISDEAA also contains its own rules for interpreting federal laws and regulations.  Section 5392(a) provides that:

> Except as otherwise provided by law, the Secretary shall interpret all Federal laws, Executive Orders, and regulations in a manner that will facilitate—
> (1) the inclusion of programs, services, functions, and activities (or portions thereof) and funds associated therewith, in the agreements entered into under this section;
> (2) the implementation of compacts and funding agreements entered into under this subchapter; and
> (3) the achievement of tribal health goals and objectives.

25 U.S.C. § 5392(a).  Section 5392(f) provides that "[e]ach provision of this subchapter and each provision of a compact or funding agreement shall be liberally construed for the benefit of the Indian tribe participating in self-governance and any ambiguity shall be resolved in favor of the Indian tribe."  25 U.S.C. § 5392(f).

11

**GENERAL ALLEGATIONS**

39.    NSHC participates in IHS's self-governance program on behalf of its twenty member tribes as a Co-Signer to the ATHC and pursuant to its Funding Agreement with the IHS under the ISDEAA.  NSHC is headquartered in Nome, Alaska, and serves villages throughout the Bering Strait region.

40.    At least five villages within NSHC's service area, including the City of Wales, do not have piped water or sewer.  Hundreds of additional households outside of those communities also lack access to running water or other convenient means through which to access clean water for drinking and personal hygiene.

41.    The City of Wales owns and operates a washeteria that provides laundry, shower, and toilet facilities as well as clean drinking water.  Users of the facility must pay for drinking water and access to laundry and shower services.

42.    Like other washeterias throughout the region, the Wales Washeteria is generally underfunded and faces numerous operational challenges.  Despite construction of a new washeteria building in 2022, the Wales facility is still served by an aging 500,000-gallon water storage tank that is several decades old, inadequate to serve the existing community, and subject to leaks and freezing along the distribution line.  Water tank stores in Wales were depleted in 2023 and 2025, and in the spring of 2026 the village was on a water ration.  Since NSHC's health clinic and staff housing quarters rely on this water supply, these deficiencies directly impact its clinic operations and overall ability to provide health care services to beneficiaries in the City of Wales.

43.    NSHC considers access to clean water and hygiene facilities to be a critical part of its public health responsibility.

12

44.    Section 3.4.9 of NSHC's Funding Agreement with IHS authorizes NSHC to provide environmental health services, including washeterias.  Appendix B to the Funding Agreement lists "Washeterias" located in "All Villages" as among the facilities used by NSHC to carry out PSFAs under the ATHC and ISDEAA Funding Agreement, specifically including (but not limited to) PSFAs under Section 3.4.9 of the Funding Agreement.

45.    Because it is impractical and cost prohibitive for NSHC to construct its own separate washeteria facilities in each of the villages it serves, on August 1, 2025, NSHC entered into a lease with the City of Wales in order to provide washeteria and other services to its IHS health program beneficiaries.  The lease between NSHC and the City of Wales is for an allocable share of the Wales Washeteria facility based on NSHC's estimated proportional usage, which is 40%.  The lease agreement states that:

> "The purpose of this Lease is to provide Lessee with access to and use of designated space and facilities for the administration and delivery of programs and services pursuant to the Indian Self-Determination and Education Assistance Act (the "ISDEAA"), the Alaska Tribal Health Compact, and funding agreements between the Lessee and the [IHS]."

46.    NSHC uses the Wales Washeteria to administer and deliver services to eligible NSHC beneficiaries through the Wales Wellness Center Program.  As part of the Wales Wellness Center Program, NSHC staffs a personal care/wellness attendant who utilizes both dedicated and shared space within the facility to deliver services to NSHC beneficiaries.

47.    Beneficiaries who enroll in the Wellness Center program operated by NSHC out of the Wales Washeteria enjoy free access to washeteria services, including bathing and laundry services, based on their beneficiary status.

48.    The lease agreement between NSHC and the City of Wales provides at Section 5 that Lessee (NSHC) shall pay rent in the amount of $24,000 annually ($2,000 per month).  It

further provides, at Section 5.A and Section 8.B, that Lessee may incur additional costs related to its use of the property, for which Lessor will not be responsible absent written agreement, and that Lessee may conduct or contribute to repairs and maintenance as necessary for its use of the leased Premises.

49.    Additionally, while the lease agreement between NSHC and the City of Wales provides at Section 3.A.(v) that the Lessor shall maintain a reserve account for building repair, it further states that this "may be accomplished by the Lessee [NSHC] depositing a certain amount of funds, to be mutually agreed upon by the Parties, into a reserve account held by a third party."

50.    The lease agreement between NSHC and the City of Wales provides at Section 6 that Lessee may assign or sublet its interest with Lessor's prior written consent, but that "Lessor specifically agrees that Lessee may sublet its leasehold interest in the Premises to the IHS under section 105(*l*) of the ISDEAA[.]"

51.    On August 12, 2025, NSHC submitted a proposal for IHS to enter into a lease under section 105(*l*) of the ISDEAA for the portion of the Wales Washeteria that NSHC leases from the City of Wales.  In the proposal, NSHC provided that:

> "[b]oth Wales and NSHC jointly use the Facility to administer and deliver services; however, NSHC's delivery of services is limited to its beneficiaries. The lease is therefore not for identifiable square footage within the Facility, but rather a percentage of the Facility and associated costs, which is proportionate to NSHC's use to provide no-cost services to its beneficiaries."

52.    NSHC's section 105(*l*) lease proposal cited the three lease compensation options set out in the ISDEAA leasing regulations at 25 C.F.R. § 900.74, and proposed that compensation be based on the first option: fair market rental, as established by a certified appraiser.  *See* 25 C.F.R. § 900.74(a).  Specifically, NSHC proposed that the section 105(*l*) compensation amount should be 40% of the annual fair market rental (appraised at $800,039), or

$320,016, based on NSHC's proportional share of the facility under its lease agreement with the City of Wales.

53.    NSHC's proposed section 105(*l*) lease agreement included a Section 8, which reads as follows: "**<u>Incorporation:</u>** This lease will be included as an attachment to Norton Sound Health Corporation's ISDEAA funding agreement and will be deemed a part thereof."

54.    Approximately three weeks after submission, on September 2, 2025, NSHC requested an update on the status of the proposal from IHS, but IHS did not respond.

55.    On September 5, 2025, NSHC's attorney followed up with IHS on behalf of NSHC to request an update from IHS on the status of the proposal.

56.    On September 11, 2025, the acting area director of the Alaska Native Health Service finally responded to NSHC's e-mail requests, informing NSHC that the proposal was under review by the section 105(*l*) program and an official response should be expected.  In the same e-mail exchange, the acting area director of the Alaska Area Native Health Service requested a timeline for review from the section105(*l*) program staff.  That timeline was never provided.

57.    NSHC continued to request periodic updates on the status of the review; however, IHS did not respond, nor did it provide a timeline for completing the review.

58.    On September 30, 2025, NSHC submitted its Final Offer under Title V of the ISDEAA.  The Final Offer included a copy of the lease proposal as previously submitted on August 12, 2025, as well as a separate amendment to NSHC's Funding Agreement to formally incorporate the lease for the Wales Washeteria as required in Section 8 of the proposed section 105(*l*) lease.  The Funding Agreement amendment proposed to add "34) Wales Washeteria" to

Section 9.2 of NSHC's ISDEAA Funding Agreement, which lists all the facilities for which a section 105(*l*) lease is incorporated.

59.  On October 3, 2025, the IHS responded to the section 105(*l*) lease request by letter from Stacey L. Ecoffey, Deputy Director for Intergovernmental Affairs, IHS Headquarters, to Angie Gorn, President/CEO of NSHC (hereinafter "Lease Denial Letter").  The Lease Denial Letter states that it "is the final agency determination to deny the request for the section 105(*l*) lease for the Wales Washeteria and is based on the documents and information provided by NSHC, agency records, and publicly available information."

60.  In the Lease Denial Letter, the IHS took the position that "NSHC does not use the Washeteria for the administration and delivery of services under the ISDEAA as required by 25 U.S.C. § 5324(*l*)(1)."  According to the IHS, "[t]he Washeteria is a facility used by the City of Wales to operate and maintain a washeteria for the general public."  The IHS further reasoned that:

> "only facilities used to carry out authorized services may be eligible for a lease . . . [and] IHS is not authorized to administer a program for the operation of washeterias to provide laundry and shower services –the program underlying Norton Sound's requested lease. IHS does not operate washeterias or provide standalone laundry or shower facilities to IHS beneficiaries."

The Lease Denial Letter did not acknowledge that washeteria services are already included in section 3.4.9 of NSHC's ISDEAA Funding Agreement.

61.  Second, the IHS took the position that "[t]o the extent NSHC provides services under the ISDEAA at the Washeteria, these services are de minimis and duplicate services provided at a facility funded under a section 105(*l*) lease agreement."  The IHS reasoned that the IHS has already entered section 105(*l*) leases for other facilities in Wales and elsewhere,

including a health clinic facility in Wales, and "leasing a separate facility to provide de minimis and ad hoc services is not reasonable when the health clinic is sufficient."-

62.    Third, the IHS took the position that the "compensation requested is not reasonable as required by 25 U.S.C. § 5324(*l*)(2) and implementing regulations at 25 C.F.R. § 900.70."  The IHS reasoned that because NSHC's requested compensation amount was higher than the monthly rental amount identified in the lease agreement between NSHC and the City of Wales, it is not reasonable.

63.    Fourth, the IHS took the position that "[t]he compensation requested duplicates funding NSHC receives in violation of 25 U.S.C. § 5324(*l*)(2) and implementing regulations at 25 C.F.R. § 900.70."  Again, the IHS reasoned that because the IHS has already entered into a section 105(*l*) lease for a health clinic "which is sufficient for the size and scope of the program in Wales[,]" "[l]easing additional space in the City of Wales is not reasonable and duplicates the lease compensation NSHC receives."

64.    In the Lease Denial Letter, IHS purported to limit the scope of its denial to the proposed section 105(*l*) lease itself and noted that "IHS will issue an agency decision on the final offer separately from this decision."

65.    On November 14, 2025, IHS responded to the Final Offer by letter from Philip B. Smith, then-Acting Director of the IHS, to Angie Gorn, President/CEO of NSHC (hereinafter "Final Offer Rejection Letter").

66.    In the Final Offer Rejection Letter, the IHS stated "[a]s a threshold matter," that "the final offer procedures under 25 U.S.C. § 5387(b) are not available to [NSHC], and therefore, the IHS denies the final offer."

67.    IHS asserted in the Final Offer Rejection Letter that "[t]he determination of the eligibility of a facility for a section 105(*l*) lease is not subject to the final offer procedures under 25 U.S.C. § 5387(b) because section 105(*l*) of the ISDEAA, 25 U.S.C. §§ 5324(l)(1)-(2), is the controlling provision[.]"  IHS acknowledged that "Courts have determined that a Tribe may propose to amend the funding agreement to incorporate an eligible section 105(*l*) lease," citing *Maniilaq I*, 72 F. Supp. 3d 227; *Maniilaq Association v. Burwell*, 170 F. Supp. 3d 243 (D.D.C. 2016) (hereafter "*Maniilaq II*"); *Jamestown S'Klallam Tribe v. Azar*, 486 F. Supp. 3d 83 (D.D.C. 2020).  "However," IHS reasoned, "the plain fact remains that if the facility in question is not eligible to lease under section 105(*l*) of the ISDEAA, then that denied lease cannot be incorporated into a funding agreement."

68.    The Final Offer Rejection Letter asserted that the Wales Washeteria is not eligible for a section 105(*l*) lease in part because "[t]he IHS does not find that the Norton Sound holds title to, a leasehold interest in, or a trust interest in, the Wales Washeteria."  The IHS took the position that the lease agreement between NSHC and the City of Wales does not functionally qualify as a lease and instead functions as a "service contract."

69.    The Final Offer Rejection Letter also reiterated the IHS's position that the Wales Washeteria is not eligible for a section 105(*l*) lease "because the operation and maintenance of a washeteria is not an authorized program, service, function, or activity that may be incorporated into a Title V funding agreement" and "no Federal law . . . authorizes the IHS to carry out a program for the operation and maintenance of sanitation facilities, including a washeteria"; that any authorized services provided by NSHC at the Wales Washeteria are "de minimis" and could be provided at the health clinic building; and that the proposed compensation is not reasonable

18

and would duplicate funding already received by NSHC for the Wales Health Clinic and the Nome Operations Building, where NSHC administers its Office of Environmental Health.

70.     Additionally, the IHS took the position that NSHC "did not follow the procedural requirements" for a final offer because its initial August 12, 2025 proposal "did not include a proposal to amend the term(s) of the funding agreement to incorporate the lease" that was separate from the proposed section 105(*l*) lease itself.  The Final Offer Rejection Letter reasoned, "[p]ractically, Title V of the ISDEAA requires a Tribe to propose an amendment to the term(s) of the funding agreement for the IHS to consider and for there to be a disagreement on said term(s) before a Tribe may submit a final offer."

71.     Alternatively, the IHS took the position that even if the final offer procedures are available, the IHS must reject the final officer pursuant to two of the final offer rejection criteria at 25 U.S.C. § 5387(c).

72.     First, for the same reasons already stated and because "[t]he IHS is prohibited from obligating appropriated funds for unauthorized activities[,]" the IHS reasoned in its Final Offer Rejection Letter that "[t]he amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled under Title V of the ISDEAA" (citing 25 U.S.C. § 5387(c)(1)(A)(i)).

73.     The IHS further reasoned that "the program, service, function, or activity (or portion thereof) that is the subject of the final offer is an inherent Federal function that cannot legally be delegated to an Indian tribe[,]" citing 25 U.S.C. § 5387(c)(1)(A)(ii).  According to the IHS, "[t]hrough the requested section 105(*l*) lease agreement and proposed amendment, the Norton Sound seeks to establish a new program authorization for a washeteria" and "[a]

19

determination of whether a program is authorized or not is an inherent Federal function that cannot be delegated."

74.     Following receipt of the IHS's letters, NSHC sought a meeting with IHS leadership to learn more about the agency's reasons for denying the lease proposal and better understand the options available to them.  That meeting was initially scheduled for February 18, 2026, in Washington, D.C., but was cancelled by the IHS on February 13, 2026.

75.     In its e-mail notifying NSHC of its cancellation of the February 18, 2026 meeting, the IHS stated that the meeting could not occur "on the specific topic of the Wales Washeteria at this time because it is still subject to either technical assistance at the Area Office or Appeal[.]" IHS referenced its November 14, 2025 Final Offer Rejection Letter, specifically including a passage stating that "the IHS will provide the Norton Sound with technical assistance to overcome the stated grounds for objections" and that NSHC should contact Mr. Lyle Claw, Acting Area Director, to request such technical assistance.

76.     By letter dated February 23, 2026, transmitted via e-mail on February 24, 2026, NSHC contacted Mr. Claw and Evangelyn Castagna in the Alaska Area Office to request a meeting.  In that letter, NSHC emphasized the importance of washeterias in maintaining health and hygiene in communities where individual households lack running water.  NSHC also wrote, "[u]nfortunately, as you and your team know from your last on-site visit, washeterias are significantly underfunded and extremely dilapidated, which is why we are seeking to operate the facilities and oversee their improvement for our communities."  The letter further stated:

> "We continue to be confused and perplexed by the IHS position: on the one hand agreeing to language in our [Funding Agreement] that specifically refers to washeteria functions and comments made by your team members during your last visit to one of our communities that they understand the need for these facilities, and on the other hand the steadfast refusal to enter into a fully funded 105(*l*) lease for a washeteria."

77.     On or about March 18, 2026, personnel from the Alaska Area Office met with NSHC in response to NSHC's February 23, 2026 meeting request.

78.     By e-mail dated March 19, 2026, NSHC President/CEO Angie Gorn thanked Mr. Claw and Ms. Castagna for the meeting and transmitted several follow-up documents, including a PowerPoint presentation that had been shared at the meeting.  Those materials, including the PowerPoint presentation, provided information intended to further explain the basis and need for NSHC's proposal and respond to issues raised by the IHS in its Final Offer Rejection Letter as part of the technical assistance process.

79.     Among other things, and in addition to reiterating the critical importance of washeteria facilities to the public health in NSHC's service area, the materials provided explained that washeterias are not duplicative of clinic space because NSHC clinics cannot provide laundry, bathing, and drinking water to NSHC beneficiaries and organizational policies do not allow the public use of clinic bathrooms and laundry services to meet individual wellness needs.

80.     The materials provided by NSHC reiterated that city-operated washeteria services are not free to the general public and provided estimates of the average costs to families to access washeteria services in five of those villages, including Wales.  Based on those costs, NSHC estimated that the washeteria services provided for free to beneficiaries through the Wales Wellness Center program are valued at approximately $980,000 per year.

81.     The materials provided further details regarding the poor condition and operational challenges faced by washeterias in the NSHC service area, including Wales, and reiterated that NSHC's lease with the City of Wales assigns to NSHC responsibility for repairs and replacement needs.

82.     IHS did not change its position on the proposed section 105(*l*) lease or offer NSHC any advice or technical assistance to overcome the objections set out in its October 3, 2025 and November 14, 2025 letters rejecting the section 105(*l*) lease proposal and final offer.

**CAUSES OF ACTION**

COUNT 1—Declaratory Relief: NSHC's Proposal is Subject to the ISDEAA Title V Final Offer Provisions

83.     The allegations in Paragraphs 1–82 are herein incorporated by reference.

84.     The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes this Court to grant declaratory relief.

85.     In the Final Offer Rejection Letter, the IHS states that the final offer procedures under 25 U.S.C. § 5387(b) "are not available" to NSHC, "and therefore, the IHS denies the final offer."

86.     The IHS acknowledges in the Final Offer Rejection Letter that "Courts have determined that a Tribe may propose to amend the funding agreement to incorporate an eligible section 105(*l*) lease[,]" but takes the position that "[t]he initial request to determine the eligibility of a facility for a section 105(*l*) lease is not subject to the final offer procedures[.]"

87.     This distinction is not supported by the caselaw cited in the Final Offer Rejection Letter or by the statutory framework on which that caselaw relies.  *See Maniilaq I*, 72 F. Supp. 3d 227; *Maniilaq II*, 170 F. Supp. 3d 243; *Jamestown S'Klallam Tribe v. Azar*, 486 F. Supp. 3d 83 (D.D.C. 2020).

88.     The Title V final offer provisions apply whenever "the Secretary and a participating Indian tribe are unable to agree, in whole or in part, on the terms of a compact or funding agreement (including funding levels)[.]"  25 U.S.C. § 5387(b).

89.     Under Title V, "Funding Agreement Terms" include: "(1) terms that generally identify the programs, services, functions, and activities (or portions thereof) to be performed or administered," and, with respect to those PSFAs,

(A)     the general budget category assigned;
(B)     the funds to be provided, including those funds to be provided on a recurring basis;
(C)     the time and method of transfer of the funds;
(D)     the responsibilities of the Secretary; and
(E)     any other provision with respect to which the Indian tribe and the Secretary agree."

5 U.S.C. § 5385(d).

90.     Section 105(*l*) of the ISDEAA requires the Secretary to compensate Indian tribes or tribal organizations, through a lease mechanism, for facilities costs associated with carrying out the PSFAs under their ISDEAA agreements.  25 U.S.C. § 5324(*l*).

91.     In *Maniilaq I*, the court affirmed that a Section 105(*l*) lease identifies "the funds to be provided, including those funds to be provided on a recurring basis" in support of compacted PSFAs, within the meaning of 25 U.S.C. § 5385(d).  *Maniilaq I*, 72 F. Supp. 3d at 238.  A section 105(*l*) lease also identifies the "method of transfer of the funds" and "the responsibilities of the Secretary."  25 U.S.C. § 5385(d)(2)(C), (D).  Therefore, a section 105(*l*) lease may be proposed by a tribe or tribal organization to be incorporated as a funding agreement term.

92.     The Title V final offer provisions are not limited to proposed compact or funding agreement terms (including funding levels) that the IHS has already determined are "eligible" or otherwise appropriate.  Rather, the Title V final offer provisions apply when "the Secretary and a participating Indian tribe are *unable to agree*" on the appropriateness of a tribe's or tribal

23

organization's proposed terms.  25 U.S.C. § 5387(b) (emphasis added).  Resolution of that disagreement is the purpose of the final offer provisions.

93.    The Title V final offer provisions at 25 U.S.C. § 5387(c)(1)(A) identify four specific grounds on which the IHS may reject a final offer, including that "the amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled under this subchapter[.]"  25 U.S.C. § 5387(c)(1)(A)(i).

94.    If a tribe or tribal organization submits a final offer for a section 105(*l*) lease proposal for a facility that is not eligible for a section 105(*l*) lease, the final offer provisions permit the IHS to reject that final offer by establishing that "the amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled" under section 105(*l*) and its implementing regulations because the facility is ineligible.  25 U.S.C. § 5387(c)(1)(A)(i).  Alternatively, the IHS may establish that one of the other statutory rejection criteria applies.

95.    The ISDEAA does not permit the IHS to create threshold eligibility determinations to avoid the final offer procedures, including the enumerated rejection criteria, under Title V.

96.    The Final Offer Rejection Letter separately asserts that the Title V final offer provisions do not apply to NSHC's Final Offer because NSHC submitted a separate proposed amendment to its ISDEAA Funding Agreement, along with the proposed section 105(*l*) lease agreement, with its final offer "for the first time."  The IHS takes the position that because NSHC did not submit a standalone amendment prior to the Final Offer, there was no opportunity "for the IHS to consider and for there to be a disagreement" on NSHC's proposed Funding Agreement terms.

24

97.     The proposed section 105(*l*) lease agreement that was first submitted by NSHC to the IHS on August 12, 2025, expressly stated in Section 8 that "[t]his lease will be included as an attachment to Norton Sound Health Corporation's ISDEAA funding agreement and will be deemed a part thereof."  This provision of the proposed lease notified the IHS at that time that NSHC was submitting the 105(*l*) lease proposal to be incorporated into its ISDEAA Funding Agreement.

98.     The proposed amendment to the ISDEAA Funding Agreement included by NSHC in the Final Offer would add "34) Wales Washeteria" to the existing Section 9.2 of NSHC's Funding Agreement, which lists all of the facilities for which a section 105(*l*) lease is incorporated.  The proposed amendment did not include any additional changes to the Funding Agreement or add anything new to the substance of NSHC's proposal.

99.     Although the IHS was notified as early as August 12, 2025, that NSHC wished to incorporate the proposed section 105(*l*) lease into its ISDEAA Funding Agreement, the IHS did not respond or provide a timeline for response to NSHC's proposal despite multiple requests that it do so.  As a result, NSHC and the IHS were "unable to agree, in whole or in part, on the terms of a compact or funding agreement (including funding levels)" that had been proposed by NSHC.  25 U.S.C. § 5387(b).

100.     Therefore, NSHC asks this Court to declare that its September 30, 2025 section 105(*l*) lease proposal and Final Offer is subject to the Title V final offer provisions at 25 U.S.C. § 5387(b)–(d), and that the IHS was legally obligated to respond to the lease proposal and Final Offer pursuant to the procedures set out in those provisions.

<u>COUNT 2—Declaratory Relief: The Portion of the Wales Washeteria Facility<br>Leased by NSHC Is Eligible for a Section 105(*l*) Lease.</u>

101.     The allegations in Paragraphs 1–100 are incorporated herein by reference.

102.    The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes this Court to grant declaratory relief.

103.    Section 105(*l*)(1) of the ISDEAA, 25 U.S.C. § 5324(*l*), provides:

(1) Upon the request of an Indian tribe or tribal organization, the Secretary shall enter into a lease with the Indian tribe or tribal organization that holds title to, a leasehold interest in, or a trust interest in, a facility used by the Indian tribe or tribal organization for the administration and delivery of services under this chapter.

104.    In the Final Offer Rejection Letter, IHS asserts that the Wales Washeteria is ineligible for a section 105(*l*) lease because NSHC does not have a leasehold interest in the facility.  IHS asserts that the lease agreement between NSHC and the City of Wales "function[s]" as a "service contract" instead of a lease.

105.    A "Leasehold interest" is defined as "A lessor's or lessee's interest under a lease contract."  Black's Law Dictionary (12th ed. 2024).  A "Lease" is defined as "[a] contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration."  *Lease*, Black's Law Dictionary (12th ed. 2024).

106.    The agreement between NSHC and the City of Wales is entitled "Lease Between Norton Sound Health Corporation and City of Wales for the Wales Washeteria."  Section 1 of the agreement states, "Lessor does hereby lease to the Lessee, and Lessee does hereby lease from Lessor, a portion of the Wales Washeteria" located as described therein.  Section 1 further states, "[t]he Premises will be jointly used by Lessor and Lessee.  Lessee's lease is for their proportional share of the Premises based on estimated proportional usage, which is 40%."

107.    Section 2 of the agreement states:

The purpose of this Lease is to provide Lessee with access to and use of designated space and facilities for the administration and delivery of programs and services pursuant to the Indian Self-Determination and Education Assistance Act (the "ISDEAA"), the Alaska Tribal Health Compact, and funding agreements

26

between the Lessee and the United States of America, Secretary of the Department of Health and Human Services, acting through the Indian Health Service (the "IHS").  This shall include designated storage space for Lessee's exclusive use, as well as shared use of and access to staff restrooms and the washeteria facilities.

108.    Pursuant to Section 3 and Section 5 of the agreement, NSHC as Lessee is obligated to pay rent in the amount of $24,000 annually in exchange for its access to and use of the leased Premises, and may incur other costs relating to its use of the facility and make contributions to a reserve account for building repair.

109.    The agreement between NSHC and the City of Wales is therefore a lease agreement that confers to NSHC a leasehold interest in its allocable share of the Wales Washeteria.

110.    In the Final Offer Rejection Letter, IHS also asserts that the Wales Washeteria is ineligible for a section 105(*l*) lease because NSHC does not use the Wales Washeteria for the administration and delivery of services under the ISDEAA, as required by 25 U.S.C. § 5324(*l*)(1).

111.    Section 3.4.9 of NSHC's ISDEAA Funding Agreement states that NSHC operates an Office of Environmental Health which, among other things, "[p]rovides inspections of the hospital and clinics; water testing laboratory; **washeterias**; technical assistance, training and research to help protect the public from illness and injury related to problems with water, waste, food, air, pests, safety, hazardous waste sites and bioterrorism."  (Emphasis added.)

112.    NSHC uses the Wales Washeteria for the administration and delivery of washeteria services as provided under Section 3.4.9 of its ISDEAA Funding Agreement, approved and entered into by the IHS.

27

113.    Appendix B to the Funding Agreement identifies "Washeterias" located in "All Villages" as facilities that are used by NSHC to carry out PSFAs.  *See* Section 3.4.9 of the Funding Agreement.

114.    In addition, NSHC operates the Wales Wellness Center program in the Wales Washeteria as part of its public health program under Section 3.8 and other terms of the Funding Agreement.  The Wales Wellness Center employs a dedicated Wellness Attendant stationed at the Wales Washeteria to facilitate free access to washeteria services, distribute over-the-counter health care products, answer questions, and provide public health resources to NSHC beneficiaries free of charge, among other functions.

115.    In the Final Offer Rejection Letter, the IHS asserts that NSHC "does not use the Wales Washeteria for services under the ISDEAA because the operation and maintenance of a washeteria is not an authorized program, service, function or activity that may be incorporated into a Title V funding agreement" and "[n]o Federal law . . . authorizes the IHS to carry out a program for the operation and maintenance of sanitation facilities, including a washeteria."

116.    Contrary to the IHS's assertion, the Snyder Act, Pub. L. No. 67-85, 42 Stat. 208 (1921) (codified at 25 U.S.C. § 13); the Transfer Act, Pub. L. No. 83-568, § 1, 68 Stat. 674 (1954) (codified at 42 U.S.C. § 2001); the IHCIA, at 25 U.S.C. §§ 1603(11), 1621b, 1632(b)(2), & 1638e; and the Sanitation and Facilities Construction Act, at 42 U.S.C. § 2004a(a)(1), (3)–(4), authorize the IHS to carry out programs for the operation and maintenance of sanitation facilities, including washeterias, and therefore such programs may properly be included in an ISDEAA Title V funding agreement.  *See Saint Regis Mohawk Tribe v. United States*, No. 8:24-CV-01479, 2026 WL 877117 (N.D.N.Y. Mar. 31, 2026).

117.    For the reasons stated herein, NSHC asks this Court to declare that: (1) NSHC holds a leasehold interest in the Wales Washeteria for purposes of section 105(*l*) of the ISDEAA, pursuant to its agreement with the City of Wales; (2) NSHC uses the Wales Washeteria for the administration and delivery of authorized services under the ISDEAA as required under section 105(*l*), including but not limited to washeteria services included in Section 3.4.9 of NSHC's ISDEAA Funding Agreement; and (3) the portion of the Wales Washeteria leased by NSHC is therefore eligible for a section 105(*l*) lease from the IHS.

COUNT 3—Mandamus and Injunctive Relief: Reverse the Rejection of the Final Offer and Compel the Secretary to Award and Fund the Final Offer as Proposed.

118.    The allegations in Paragraphs 1–117 are incorporated herein by reference.

119.    25 U.S.C. Section 5331(a) authorizes this Court to provide:

. . . appropriate relief including money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this chapter or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this chapter or regulations promulgated hereunder[.]

25 U.S.C. § 5331(a).  The language "to award and fund an approved self-determination contract" applies also to self-governance compacts and funding agreements.  Section 5391(a) of Title V of the ISDEAA provides that: "For purposes of section 5331 of this title, the term 'contract' shall include compacts and funding agreements entered into under this subchapter." 25 U.S.C. § 5391(a).

120.    The IHS rejected the Tribe's Final Offer in violation of the ISDEAA.

121.    In the Final Offer Rejection Letter, IHS asserts that "the amount of funds proposed in the final offer exceed the applicable funding level to which [NSHC] is entitled under Title V of the ISDEAA[,]" citing 25 U.S.C. § 5387(c)(1)(A)(i).  IHS bases this rejection on the assertion that there is no statutory authority for the operation and maintenance of a washeteria,

and its related conclusion that the authorized ISDEAA services provided at the Wales Washeteria are therefore de minimis and/or duplicate the services provided at the Wales Health Clinic, which IHS already funds under a section 105(*l*) lease.

122. The IHS fails to consider the full scope of authority granted to the agency under the Snyder Act, the IHCIA, and the Sanitation and Facilities Construction Act, and these laws do in fact provide the IHS with the necessary authorization to carry out routine maintenance and operation of sanitation facilities, including washeterias.

123. The IHS fails to acknowledge or consider that the IHS already authorized the provision of washeteria services in section 3.4.9 of NSHC's Funding Agreement and the use of washeteria facilities under Appendix B to the Funding Agreement.

124. The IHS fails to acknowledge that the clinic facility and the Wales Washeteria serve different functions, and that washeteria services cannot be provided out of any of NSHC's other facilities, because the IHS bases its rejection decision on the faulty premise that washeteria services are not authorized.

125. With respect to the proposed compensation amount, the Final Offer Rejection Letter further concludes that "[t]he fair market rental rate proposed is unreasonable since the Norton Sound does not pay this sum to the City of Wales."

126. The IHS does not acknowledge that the lease agreement between NSHC and the City of Wales permits NSHC to incur costs in connection with its use of the facility above and beyond its monthly rental amount, and to contribute to a reserve account for building repair, in order to maintain the washeteria facility in a condition suitable for the delivery of services to NSHC beneficiaries under the Funding Agreement.

30

127.    Further, section 105(*l*) regulations at 25 C.F.R. § 900.74 expressly provide three options for compensation of a section 105(*l*) lease, including that "[t]he lease may be based on fair market rental." None of the regulatory compensation options, including fair market rental, are contingent upon the amount paid by the tribe or tribal organization for its leasehold interest in the eligible facility.

128.    The compensation amount proposed by NSHC was based on the fair market rental value of the Wales Washeteria, as determined by an independent certified appraiser and expressly permitted under 25 C.F.R. § 900.74, and was reduced to 40% to account for NSHC's leased allocable share of the facility.

129.    Therefore, the IHS fails to meet its burden to support rejection of NSHC's final offer under the first rejection criterion set forth at 25 U.S.C. § 5387(c)(1)(A)(i).

130.    IHS also cites the second statutory rejection criteria, at 25 U.S.C. § 5387(c)(1)(A)(ii), asserting that "[t]he program, service, function, or activity (or portion thereof) that is the subject of the final offer is an inherent Federal function that cannot legally be delegated to [NSHC]." IHS asserts that by submitting a section 105(*l*) lease request for washeteria services, NSHC seeks to establish a new program authorization, which is an inherent federal function that cannot be delegated.

131.    NSHC's final offer does not propose to assume responsibility for establishing new program authorizations. Rather, NSHC proposes to enter into a section 105(*l*) lease for a facility NSHC uses to administer and deliver PSFAs that are already included in NSHC's ISDEAA Funding Agreement.

132.    The IHS failed to meet its burden under the ISDEAA for the rejection of a final offer under 25 U.S.C. Section 5387(c).

31

133.    In the absence of a properly supported rejection, the Final Offer must be accepted. 25 U.S.C. § 5387(b).

134.    The regulations governing final offers require that "[a]fter the Indian Tribe's final offer is accepted or deemed accepted, the terms of the Indian Tribe's final offer and any funds included therein, shall be added to the funding agreement or compact within 10 days of the acceptance or the deemed acceptance." 42 C.F.R. § 137.138.

135.    Mandamus and injunctive relief are therefore appropriate to compel IHS to enter the proposed lease of the Wales Washeteria submitted as part of the Final Offer and to incorporate the lease into NSHC's Funding Agreement along with necessary language to implement the terms of the Final Offer.

136.    Mandamus and injunctive relief are appropriate to compel IHS to pay NSHC $320,016 annually in compensation under the lease for use of the Wales Washeteria to provide health services pursuant to section 3.4.9 of NSHC's ISDEAA Funding Agreement.

<u>COUNT IV: Alternative Declaratory and Injunctive Relief</u>

137.    The allegations in Paragraphs 1–136 are incorporated herein by reference.

138.    Even if this Court were to determine that NSHC's section 105(*l*) lease proposal for the Wales Washeteria is not subject to the Title V final offer provisions at 25 U.S.C. section 5387(b)–(d), section 5331(a) authorizes this Court, in any civil action or claim against the appropriate Secretary, to provide injunctive relief "against any action by an officer of the United States or any agency thereof contrary to this chapter or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under" the ISDEAA or its implementing regulations. 25 U.S.C. § 5331(a).

139.    The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides an independent remedy, authorizing this Court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

140.    The IHS's Lease Denial Letter and Final Offer Rejection Letter both improperly deny NSHC's request for a lease of its allocable share of the Wales Washeteria under section 105(*l*) of the ISDEAA, in violation of the ISDEAA.  In mandatory terms, section 105(*l*) requires the IHS to enter into a lease with an Indian tribe or tribal organization that holds title to, a leasehold interest in, or a trust interest in, a facility used by that Indian tribe or tribal organization for the administration and delivery of services under the ISDEAA.  25 U.S.C. § 5324(*l*).

141.    NSHC holds a leasehold interest in its allocable share of the Wales Washeteria under its lease agreement with the City of Wales, and it uses that facility for the administration and delivery of services under its ISDEAA funding agreement with the IHS, including but not limited to the provision of washeteria services under Section 3.4.9 of NSHC's funding agreement.

142.    Section 105(*l*) also mandates that the IHS shall compensate a tribe or tribal organization that enters into a section 105(*l*) lease.  25 U.S.C. § 5324(*l*)(2).  Likewise, implementing regulations at 25 C.F.R. § 900.69 mandate compensation.  The regulations at 25 C.F.R. section 900.74 provide tribes with three options for compensation, including that "[t]he lease may be based on fair market rental."

143.    NSHC's proposed lease compensation amount is based on fair market rental, as determined by an independent certified appraiser.

144.    The IHS's rejection of NSHC's section 105(*l*) lease proposal for the Wales Washeteria was contrary to the ISDEAA and its implementing regulations.  Accordingly, if this

Court determines that the lease proposal is not subject to the final offer provisions of Title V of the ISDEAA, NSHC asks this Court in the alternative to: (1) declare that NSHC's allocable share of the Wales Washeteria pursuant to its lease agreement with the City of Wales is eligible for a lease under section 105(*l*) of the ISDEAA, 25 U.S.C. § 5324(*l*); and (2) issue injunctive relief under 25 U.S.C. § 5331(a) ordering Defendants to award and fund the section 105(*l*) lease for the Wales Washeteria as proposed by NSHC and as required under 25 U.S.C. § 5324(*l*) and its implementing regulations at 25 C.F.R. Part 900, subpart H.

## PRAYER FOR RELIEF

145.    Section 5331(a) of the ISDEAA authorizes this Court to provide appropriate relief including money damages, injunctive relief against any action by the Defendants contrary to the ISDEAA or its implementing regulations, and mandamus to compel Defendants to perform a duty provided under the ISDEAA, including immediate injunctive relief to compel Defendants to award and fund the Final Offer or otherwise to enter the proposed lease for the Wales Washeteria under section 105(*l*).  NSHC respectfully asks that this Court to:

A. Declare that its September 30, 2025 proposal was properly submitted under, and is subject to, the Title V final offer provisions at 25 U.S.C. § 5387(b)–(d) and that the IHS was legally obligated to respond under those final offer provisions;

B. Declare that the portion of the Wales Washeteria leased by NSHC for the provision of washeteria and other services under its ISDEAA Funding Agreement is eligible for a section 105(*l*) lease from the IHS under 25 U.S.C. § 5324(*l*) and implementing regulations;

34

C.  Grant mandamus and injunctive relief to reverse the IHS's rejection of NSHC's Final Offer and compel Defendants to award and fund the Final Offer, or otherwise to enter into the proposed lease of the Wales Washeteria under 25 U.S.C. § 5324(*l*);

D.  Grant mandamus and injunctive relief to compel Defendants to pay NSHC $320,016 in annual compensation under the lease for using the Wales Washeteria to provide health services pursuant to its ISDEAA Funding Agreement;

E.  Award reasonable attorney fees and costs in favor of NSHC under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable law; and

F.  Grant such other relief as the Court deems just.

Dated: July 24, 2026                                Respectfully submitted,

s/ *Caroline P. Mayhew*
Caroline Mayhew (DC Bar No. 1011766)
Geoffrey D. Strommer (OR Bar No. 931106) (*pro hac vice* motion forthcoming)
Rori D. Collins (CA Bar No. 322380) (*pro hac vice* motion forthcoming)
HOBBS, STRAUS, DEAN & WALKER, LLP
215 SW Washington Street, Suite 200
Portland, OR 97204
Telephone: 503-242-1745
Fax: 503-242-1072
E-mail: cmayhew@hobbsstraus.com
E-mail: gstrommer@hobbsstraus.com
E-mail: rcollins@hobbsstraus.com

*Counsel for Norton Sound Health Corporation*